[Cite as *State v. Pickens*, 2018-Ohio-4994.]

# IN THE COURT OF APPEALS

# FIRST APPELLATE DISTRICT OF OHIO

# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-170204 |
| | | TRIAL NO. B-0905088 |
| Respondent-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| MARK PICKENS, | : | |
| Petitioner-Appellant. | : | |

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  December 14, 2018

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings,* Assistant Prosecuting Attorney, for Respondent-Appellee,

*Kendra Roberts*, Assistant State Public Defender, for Petitioner-Appellant.

Per Curiam.

{¶1} Petitioner-appellant Mark Pickens appeals the Hamilton County Common Pleas Court's judgment dismissing his petition under R.C. 2953.21 for postconviction relief. We affirm the court's judgment.

{¶2} In 2010, Pickens was convicted of rape, having weapons while under a disability, and three counts of aggravated murder. For each murder, he was sentenced to death. The Ohio Supreme Court affirmed his convictions in 2014. *State v. Pickens,* 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023.

{¶3} Pickens also sought relief from his convictions in the 2011 postconviction petition from which this appeal derives. In 2012, the common pleas court entered judgment dismissing the petition. On appeal, we reversed that judgment and remanded the case, upon our determination that Pickens had been denied due process when the common pleas court dismissed the petition upon findings of fact and conclusions of law that had been submitted ex parte by the state, without affording Pickens notice of that submission or an opportunity to respond. *State v. Pickens,* 2016-Ohio-5257, 60 N.E.3d 20 (1st Dist.).

{¶4} On remand, the state filed proposed findings of fact and conclusions of law and notified Pickens of that filing, and Pickens filed his own proposed findings of fact and conclusions of law. In 2017, the common pleas court again entered findings of fact and conclusions of law and dismissed the petition. In this appeal from that judgment, Pickens advances four assignments of error.

### The Evidence

{¶5} Pickens was convicted of rape and aggravated murder upon evidence that on June 2, 2009, two days after Noelle Washington had reported to police that Pickens had raped her, he entered Washington's apartment and fatally shot her, her nine-month-old son, and her friend's three-year-old daughter.

2

{¶6}    Washington, having dated Pickens for several months, had recently decided to end the relationship and move to another state. At his invitation, she visited his apartment on the morning of May 31. Surveillance video of the hallway outside Pickens's apartment showed Washington, 90 minutes later, as she emerged from Pickens's apartment with disheveled hair and clothing, pounded on a neighbor's door, returned to his apartment, struggled with him in the hallway, and returned to the neighbor's apartment. The video then showed Pickens leaving the scene, and the police arriving.

{¶7}    Washington told the neighbor and the police at the scene and during a recorded interview that when she had refused Pickens's demand for sex, he displayed a handgun, restrained her, removed her clothes, forcibly raped her, and gun in hand, threatened to kill her and himself, and that when she had told him that she was calling the police, he pummeled her, took her cell phone, shoved her out of his apartment, and fled the apartment building. Washington also told the police that Pickens had subsequently texted her to ask her if she was "going to try to set him up," and that Pickens's mother had called to tell her that Pickens knew that Washington had spoken with the police. The police then recorded a phone call between Washington and Pickens, during which Pickens denied having sex with or hitting Washington and chastised her for talking to the police and "[telling] them everything."

{¶8}    Washington's rape exam revealed fresh bite marks and lacerations consistent with recent, nonconsensual sex. And she repeated her rape and assault allegations against Pickens in phone conversations with her mother, her sister, her stepbrother, and her friend, Crystal Lewis, the mother of Pickens's three-year-old victim, Sha'railyn Wright.

{¶9}    Washington also expressed to Lewis her concern that, in addition to her cell phone, Pickens had her house keys. And Washington's mother received a text message from Washington's phone, stating, "This MARK I DO NOT WANNA BE WIT YO DAUGHTER." Washington's sister followed up with two phone calls and a text to

Washington's phone number, prompting responses that included the threat, "[I]f I go to jail, then I am going to fuck her up."

{¶10} That evening, Pickens went to the home of another girlfriend, told her that he was angry because he had been accused of rape, and unsuccessfully solicited her participation in beating up his accuser. When Pickens and the woman parted, she observed a gun in the waistband of his pants and later received a text message from him, stating, "I feel like killing someone."

{¶11} The next morning, June 1, two police detectives went to Pickens's apartment to question him about Washington's allegations. When no one answered the door, one detective wrote, "Please call me," on the back of a business card and left the card in the door.

{¶12} That evening, Washington was home with her nine-month-old son, Anthony, and three-year-old Sha'railyn Wright. Earlier in the evening, Washington's cousin stopped by, and Washington repeated her rape allegation and again expressed her fear of Pickens and her concern that he had her house keys.

{¶13} Beginning at 11:12 p.m., Washington and Sha'railyn's mother, Crystal Lewis, exchanged text messages, beginning with Washington's message, "I jus woke up mark was comin thru the kitchen," continuing with Lewis's expressions of concern that Pickens could return, and ending with Washington's final message at 11:49 p.m., acknowledging Lewis's message that she was on her way to pick up Sha'railyn.

{¶14} Two witnesses testified that they had seen Washington outside her apartment building at approximately 11:40 p.m., in the midst of an animated conversation with a man subsequently identified by those witnesses as Pickens. One witness continued to observe the pair as they entered the apartment building. The witness then heard loud music and "two pops; boom, boom," then "another pop, pop," and still "another pop, pop," and the music stopped. A short time later, Lewis arrived at Washington's apartment and found the apartment door open and Washington and the two children dead.

{¶15} The crime-scene investigation revealed no signs of forced entry or a struggle, no firearm in or around the apartment, and no house keys. When the police learned that Washington had filed rape charges against Pickens on May 31, he was identified as a suspect in the murders and arrested.

{¶16} Autopsies of the victims showed that Washington had died from a single gunshot wound to the back of the head, her son had died from a close range gunshot wound to the forehead, and Sha'railyn Wright had sustained close-range gunshot wounds to two fingers on her left hand and a fatal wound behind her left ear. Three .45-caliber shell casings and a projectile were recovered from Washington's apartment. In a search of Pickens's apartment, a box containing 43 rounds of .45-caliber ammunition was recovered from his closet. The casings recovered from the crime scene, along with the three .45-caliber-automatic hollow-point bullets recovered both from the scene and during the victims' autopsies, were determined to have been fired from the same .45-caliber handgun. And the ammunition found in Pickens's closet was deemed compatible with the weapon that had fired the bullets recovered in the autopsies.

{¶17} The police recovered from Pickens's apartment Washington's son's social security card, debit and public-assistance cards in Washington's name, a bicycle, and a jacket. The cuffs and sleeves of the jacket, which had been wet when the jacket was seized, tested positive for the presence of gunshot residue. Tests of lifts taken from the bicycle frame, seat, handlebars, and handles revealed the presence of primer residue consistent with contact with primer residue on another item.

{¶18} The police also reviewed surveillance video showing the hallway outside Pickens's apartment on May 31 and his arrivals and departures from his apartment on June 1 and 2. The May 31 video substantiated Washington's statement to the police concerning the events in that hallway and showed that, when the officers had knocked on Pickens's door, he had been present, but did not respond. The June 1 hallway video showed Pickens leaving his apartment at 7:33 a.m., the detective leaving his card in the

door of the apartment at 10:44 a.m., and Pickens returning to his apartment at 10:32 p.m., taking the card from the door, and five minutes later, leaving his apartment with his bicycle, wearing the jacket that later tested positive for gunshot residue. The June 2 outside video showed Pickens returning on his bicycle to his apartment building at 12:04 a.m., while the June 1 hallway video showed him returning with his bicycle to his apartment at 11:58 p.m. That discrepancy was found to be attributable to the timer on the outside video being five minutes fast and the hallway video being two minutes slow. The police subsequently clocked the trip by bicycle between Pickens's and Washington's buildings at less than four minutes.

{¶19} In his June 2 statement to police, Pickens denied raping Washington on May 31 or killing her on June 1. DNA testing had identified Pickens as the source of semen on a vaginal swab collected from Washington. Nevertheless, Pickens asserted that they had not had sex since earlier that week, and that they had done nothing more than "play[] rough" on May 31. Washington, he insisted, had left his apartment with his phone and then texted him that she had called the police because he had taken her phone and had "pulled her hair and stuff." He stated that he had spent June 1 at his mother's house until 8:00 or 9:00 p.m., when he returned to his apartment and remained there until retiring around midnight. He denied going to Washington's apartment on June 1, and he declared, variously, that he had not been there for either a month or nine months. He dismissed the possibility that others had seen him at Washington's apartment building or that surveillance video showed him leaving his apartment and later returning. He denied owning a firearm or ammunition and dismissed the possibility that the police had found ammunition in his closet. He insisted that he had not known that the police wanted to talk to him until he found the detective's card in his door the previous night. And he denied knowing what they wanted to discuss.

{¶20} The state also presented at trial testimony by a jail inmate who had been housed with Pickens in the same cell block. The jailhouse informant testified that Pickens

6

had told him, "I killed that bitch and the babies" because "the girl kept calling the police on him," that he killed Sha'railyn because she knew him and could identify him, and that he shot Washington's son "[b]ecause the baby was just there, like he got a rush out of it." The informant also testified to Pickens's statement that the .45-caliber-automatic hollow-tip bullets that he had used to shoot Washington and the children were not the same kind of ammunition that was found at his apartment. The defense sought to impeach the jailhouse informant with evidence that the informant had written to Pickens offering to not testify in exchange for $300, and that the informant had received consideration for his testimony against Pickens in the form of a plea agreement allowing him to plead guilty to a single count of voluntary manslaughter with a 13-year agreed sentence in exchange for the dismissal of aggravated-murder, murder, aggravated-robbery, robbery and weapons charges.

### Findings of Fact and Conclusions of Law

{¶21} In his first assignment of error, Pickens asserts that the common pleas court "failed[ed] to author" the findings of fact and conclusions of law filed on remand and thus "once again delegated its judicial function" under R.C. 2953.21(C) and denied him the protections of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. This argument mistakes the import of our 2016 decision.

{¶22} In that decision, we noted that R.C. 2953.21 (C) required the common pleas court, in making findings of fact and conclusions of law, to engage in a deliberative process that entailed consideration of the petition, supporting affidavits, and documentary evidence, along with the files and records of the proceedings leading to the petitioner's conviction, to determine whether "there are substantive ground for relief." *Pickens,* 2016-Ohio-5257, 60 N.E.3d 20, at ¶ 19. That deliberative process, we determined, could not be delegated. *Id.* And Pickens was denied due process, when the court's ex parte communication with the state in making its 2012 findings of fact and conclusions of law

undermined any confidence that the court had engaged in that deliberative process. *Id.* at ¶ 25, following *State v. Roberts,* 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168.

{¶23}   The common pleas court's 2017 entry on remand, like its 2012 entry, was captioned "Proposed Findings of Fact, Conclusions of Law, and Entry Dismissing Petition to Vacate."   And the court again adopted verbatim the proposed findings of fact and conclusions of law submitted by the state.   But in Pickens's initial appeal, we presumed that the court's 2012 entry had been based upon consideration of, because the entry followed the submission of, arguments presented at a hearing on the petition and the motions, along with the pleadings, motions, and responses.   *See Pickens,* 2016-Ohio-5257, 60 N.E.3d 20, at ¶ 8-9.   Similarly, we here presume that the court's 2017 entry, which followed the filing of proposed findings of fact and conclusions of law by both the state and Pickens, was additionally based upon those submissions.   Consequently, the findings of fact and conclusions of law contained in the 2017 entry were not demonstrably the product of the common pleas court's failure to engage in the deliberative process mandated by R.C. 2953.21(C).   Therefore, Pickens was not denied due process.

{¶24}   Additionally, while the deliberative process mandated by R.C. 2953.21(C) may not be delegated, the drafting responsibility may.   Thus, a court's verbatim adoption of a party's proposed findings of fact and conclusions of law will not, alone, provide a ground for reversal if those findings of fact and conclusions of law adequately advance their purposes, that is, if they cover and pertain to the material and determinative issues presented in the petition and adequately apprise the petitioner and the reviewing court of the legal and evidentiary bases for the decision denying the petition.   *State v. Calhoun,* 86 Ohio St.3d 279, 291-292, 714 N.E.2d 905 (1999), citing *State ex rel. Carrion v. Harris,* 40 Ohio St.3d 19, 530 N.E.2d 1330 (1988), and *State v. Clemmons,* 58 Ohio App.3d 45, 46, 568 N.E.2d 705 (2d Dist.1989); *State v. Powell,* 90 Ohio App.3d 260, 263, 629 N.E.2d 13 (1st Dist.1993); *State v. Sowell,* 73 Ohio App.3d 672, 676, 598 N.E.2d 136 (1st Dist.1991). *See Pickens,* 2016-Ohio-5257, 60 N.E. 3d 20, at ¶ 18.   The findings of fact and conclusions

of law contained in the 2017 entry dismissing Pickens's postconviction petition were adequate to those tasks. Accordingly, we overrule the first assignment of error.

### The Postconviction Claims

{¶25} In his second assignment of error, Pickens challenges the common pleas court's dismissal of his postconviction petition without an evidentiary hearing. We find no merit to any aspect of his challenge.

{¶26} In his postconviction petition, Pickens sought relief from his conviction on eleven grounds. To prevail on a postconviction claim, the petitioner must demonstrate a denial or infringement of his rights in the proceedings resulting in his conviction that rendered the conviction void or voidable under the Ohio or United States Constitution. R.C. 2953.21(A)(1). The petitioner bears the initial burden of demonstrating "substantive grounds for relief" through the petition, with its supporting affidavits and other documentary evidence, and the trial record. R.C. 2953.21(C). A postconviction claim is subject to dismissal without a hearing if the petitioner has failed to support the claim with evidentiary material setting forth sufficient operative facts to demonstrate substantive grounds for relief. *Id.*; *State v. Pankey*, 68 Ohio St.2d 58, 59, 428 N.E.2d 413 (1981); *State v. Jackson,* 64 Ohio St.2d 107, 413 N.E.2d 819 (1980), syllabus. Conversely, "the court must proceed to a prompt hearing on the issues" if "the petition and the files and records of the case show the petitioner is * * * entitled to relief." R.C. 2953.21(E).

{¶27} The common pleas court applied the doctrine of res judicata to bar some of Pickens's postconviction claims. Under the doctrine of res judicata, a judgment of conviction bars a defendant from raising in any proceeding, other than a direct appeal from that judgment, any claim "that was raised or could have been raised" in the direct appeal. *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (1967), paragraph nine of the syllabus. Thus, res judicata bars a postconviction claim that could fairly have been determined in the direct appeal, based upon the trial record and without resort to evidence outside the record. *Id.*; *State v Cole*, 2 Ohio St.3d 112, 114, 443 N.E.2d 169 (1982).

9

{¶28} A postconviction petitioner may resist the application of res judicata to bar his postconviction claim by supporting the claim with outside evidence. But merely submitting outside evidence will not preclude the common pleas court from applying res judicata to bar a claim. The claim must depend on the outside evidence for its resolution. *Id.* And the outside evidence must be "competent, relevant and material" to the claim, it must "meet some threshold standard of cogency" by being more than "marginally significant," and must "advance the * * * claim beyond mere hypothesis and a desire for further discovery." *State v. Coleman,* 1st Dist. Hamilton No. C-900811, 1998 WL 74756 (Mar. 17, 1993).

{¶29} When a postconviction claim depends for its resolution upon outside evidence, a common pleas court may not apply res judicata to dismiss the claim. *Perry* at paragraph nine of the syllabus; *Cole* at 114. But a reviewing court may sustain the dismissal of the claim on other grounds. *State v. Peagler,* 76 Ohio St.3d 496, 668 N.E.2d 4897 (1996), paragraph one of the syllabus; *State v. Blankenship*, 38 Ohio St.3d 116, 119, 526 N.E.2d 816 (1988). *Accord State v. Gipson,* 1st Dist. Hamilton Nos. C-960867 and C-960881, 1997 WL 598397 (Sept. 26, 1997).

{¶30} Nine of Pickens's postconviction claims sought relief on the grounds that his trial counsel had been constitutionally ineffective in investigating, preparing, and presenting his case. To prevail on a claim of ineffective assistance of counsel, a postconviction petitioner must demonstrate (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 13 (1989). To establish prejudice, the petitioner must demonstrate that counsel's deficient performance "so undermined the proper functioning of the adversarial process that the trial could not have reliably produced a just result." *State v. Powell*, 90 Ohio App.3d 260, 266, 629 N.E.2d 13

10

(1st Dist.1993), citing *Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 112 L.Ed.2d 180 (1993), and *Strickland.*

{¶31} ***Ineffective counsel—voir dire.*** Pickens contended in his first ground for relief that his trial counsel had been ineffective during voir dire in failing to question juror Carroll concerning views expressed in his juror questionnaire favoring the death penalty and in failing to exercise an unused peremptory challenge to exclude that juror because of those views and his racially biased statements. The Ohio Supreme Court rejected this challenge on direct appeal. *Pickens,* 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, at ¶ 204-214. And Pickens's postconviction challenge to his trial counsel's effectiveness in that regard was subject to dismissal under the doctrine of res judicata, because he had been represented by new counsel in his direct appeal, and the issue could fairly have been determined without evidence outside the trial record. *See Cole*, 2 Ohio St.3d at ¶ 114 and syllabus, 443 N.E.2d 169.

{¶32} ***Disproportionate imposition of death penalty.*** In his second ground for relief, Pickens contended that he had been denied rights secured by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, because in the state of Ohio and in Hamilton County, the death penalty is imposed disproportionately upon racial minorities. He supported this claim with statistical data comparing the racial make-up of the population of Ohio and Hamilton County with the racial make-up of the death-row population of the state and the county.

{¶33} Statistical evidence alone will not establish the discriminatory imposition of the death penalty. *McCleskey v. Kemp*, 481 U.S. 279, 313, 107 S.Ct.1756, 95 L.Ed.2d 262 (1987). Rather, the defendant must demonstrate that "the decisionmakers in *his* case acted with discriminatory purpose," and that such actions had a discriminatory effect on the proceeding. (Emphasis in original.) *State v. Dickerson,* 45 Ohio St.3d 206, 216, 543 N.E.2d 1250 (1989), quoting *McCleskey* at 292; *see State v. Zuern,* 32 Ohio St.3d 56, 64-66, 512 N.E.2d 585 (1987), syllabus (holding that "[t]here can be no finding that the death

penalty is imposed in a discriminatory fashion absent a demonstration of specific discriminatory intent"); *State v. Jones*, 1st Dist. Hamilton No. C-990813, 2000 WL 1886307 (Dec. 29, 2000) (holding that "[s]tatistics indicative of a disparate impact alone are insufficient to establish a claim of discriminatory enforcement of the death penalty").

{¶34} Pickens offered nothing in support of his second ground for relief that might be said to show that the decisionmakers imposing the death penalty on him had acted with a discriminatory purpose. Therefore, the common pleas court properly denied relief on that ground

{¶35} *Ineffective counsel—residual doubt.* Pickens asserted in his seventh ground for relief that his trial counsel had been ineffective in failing to present evidence documenting his "future plans," to counter the state's theory of the case, that Pickens had killed Washington out of anger over her rape allegation, and to support the defense theory during the guilt phase of the trial that he had not committed either crime and during the penalty phase of the trial that there remained residual doubt concerning his guilt.

{¶36} In his direct appeal, Pickens challenged his trial counsel's effectiveness in presenting his residual-doubt claim. In addressing this challenge, the Supreme Court noted that residual doubt has long been held to not be a mitigating factor under R.C. 2929.04(B). *Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, at ¶ 226, citing *State v. McGuire*, 80 Ohio St.3d 390, 686 N.E.2d 1112 (1997), syllabus. Nevertheless, Pickens's counsel moved before trial for permission to argue and present evidence on residual doubt as a mitigating factor and for a residual-doubt instruction. Even after that motion had been denied, counsel argued residual doubt during the penalty phase of the trial. And the trial court, in weighing the mitigating factors, "considered," yet "[gave] no weight" to residual doubt as a mitigating factor, because the evidence left "no doubt whatsoever that [Pickens had] committed the [] offenses." *Pickens* at ¶ 227.

Uncertain of what more trial counsel could have done in presenting the issue of residual doubt, the Supreme Court concluded that counsel had not been ineffective in that regard.

{¶37} The evidence offered in support of Pickens's postconviction challenge does not alter that assessment. Pickens supported his seventh ground for relief with evidence in the form of April 2009 Department of Youth Services records documenting his future plans to seek employment and attain his General Equivalency Degree, a May 2009 certificate of his completion of a home health-aid/nursing-assistant program, and documents and affidavits offered to show that on June 1, 2009, he had, "without any issue and without appearing upset," met with his probation officer after pleading guilty to and receiving a suspended sentence for unauthorized use of property.

{¶38} But the trial court, in weighing the mitigating factors, had before it Pickens's unsworn statement, during which he had spoken of his employment history, of "going to school to be a nursing assistant," and of receiving his GED from Cincinnati State University. *Id.* at ¶ 224 and 246-247. And the Supreme Court, in conducting its independent sentence evaluation, must be said to have considered, but rejected residual doubt as a mitigating factor, when the court concluded that the evidence adduced at trial proved "beyond even a residual doubt" that Pickens had murdered Washington and the children. *Id.* at ¶ 254.

{¶39} The evidence offered in support of Pickens's seventh ground for relief cannot be said to demonstrate an outcome-determinative deficiency in his trial counsel's presentation of his residual-doubt claim. Therefore, the common pleas court properly denied relief on that ground.

{¶40} *Ineffective counsel—guilt-phase evidence.* In his eighth and ninth grounds for relief, Pickens contended that his trial counsel had been ineffective in investigating and presenting his case during the guilt phase of his trial, when counsel failed to discover and present evidence countering the state's evidence that Pickens had had the opportunity to kill Washington and the children and that he had killed

Washington to escape prosecution for raping her. The common pleas court properly denied relief on those grounds without a hearing.

{¶41} Pickens asserted in his eighth ground for relief that counsel should have discovered and presented at trial evidence showing that the brakes on his bicycle had been inoperable. That evidence, he argued, would have discredited the state's timeline for the murders, which required riding the bicycle from the crime scene to his apartment building at 19 m.p.h. In support, Pickens offered the affidavit of an investigator with the Ohio Public Defender's office, who had examined the bicycle and discovered its deficiency in 2011.

{¶42} But Pickens did not provide any evidence that might be said to show the effect of inoperable bicycle brakes on his ability to cover the distance between the crime scene and his apartment within the time established by the state's evidence. Thus, with his eighth ground for relief, Pickens failed to demonstrate an outcome-determinative deficiency in trial counsel's failure to discover or present that evidence at trial.

{¶43} In his ninth ground for relief, Pickens asserted that counsel should have objected to the admission of the May 31 surveillance video showing Washington emerging from Pickens's apartment into the hallway, screaming and pounding on the neighbor's door, and then struggling with Pickens. He argued that the video, which provided no audio, had been misleading and prejudicial, because without the sound, the jury had been unaware that Washington's conduct in the hallway had been accompanied not by expressions of fear or anger at being raped, but by angry accusations concerning other women. Pickens supported the ground with his own affidavit offering his version of Washington's statements in the hallway.

{¶44} In the direct appeal, the Supreme Court rejected Pickens's challenge to the sufficiency of the evidence to establish his guilt of the R.C. 2929.04(A)(3) specification accompanying the count of the indictment charging him with the aggravated murder of Washington, which charged that he had killed her to escape detection, apprehension, trial,

14

or punishment for rape. The court found the evidence of his guilt of the R.C. 2929.04(A)(3) specification "overwhelming," based on its review of the evidence, both with and without those statements of Washington that were not admissible under the Evid.R. 804(B)(6) unavailable-declarant exception to the hearsay rule. *See Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, at ¶ 180-191.

{¶45} The Supreme Court also rejected on appeal Pickens's challenges to the sufficiency of the evidence to support his rape and aggravated-murder convictions. The court acknowledged "inconsistencies" and "discrepancies" in Washington's statements, but found that her statements and the testimony of the state's witnesses to those statements were "neither inherently unreliable nor unbelievable." And the court concluded that the evidence supporting Pickens's aggravated-murder and rape convictions was "overwhelming." *See id.* at ¶ 193-197.

{¶46} The May 31 hallway video is not inconsistent with Pickens's neighbor's testimony that Washington had told her that Pickens had raped her and that she was afraid of him. The averments of Pickens's affidavit to the contrary would have been admissible to impeach the neighbor's testimony, but would not have required exclusion of the video under Evid.R. 403(A) on the ground that it did not fairly and accurately depict Washington's conduct in the hallway that day. *See Pickens* at ¶ 153 (holding that Pickens's objections concerning the timing system or other quality problems with the state's exhibit consisting of spliced-together surveillance video went to the weight of that evidence, not its admissibility). Moreover, even without the May 31 hallway video, the evidence supporting Pickens's convictions for the rape and aggravated murder of Washington is substantial. Thus, with his ninth ground for relief, Pickens failed to demonstrate an outcome-determinative deficiency in trial counsel's performance in failing to object to the admission of the May 31 hallway video.

{¶47} *Ineffective counsel—mitigation evidence.* Pickens directed grounds for relief three through six and ground for relief ten against the adequacy

and effectiveness of his trial counsel's investigation of, preparation for, and presentation of his case in mitigation. Relief on those grounds was properly denied without an evidentiary hearing.

{¶48} During the penalty phase of Pickens's trial, his mother testified to her own childhood of abuse and experience with the foster-care system, and she asked the jury to spare her son's life. Pickens, in his unsworn statement and statement in allocution, expressed sorrow for the deaths of the victims and for his mother's pain, but maintained his innocence. In response to the trial court's questions, he affirmed that he had been 19 years old at the time of the offenses, and he spoke of his work history and getting his GED.

{¶49} In the course of its independent evaluation of Pickens's death sentences, the Supreme Court considered the nature and circumstances of his offenses and his history, character, and background, along with the R.C. 2929.04(B)(4), (5), and (7) mitigating factors: his youth at the time of his offenses; his lack of a significant criminal or juvenile delinquency history; and "other factors * * * relevant to the issue of whether [he] should be sentenced to death." *Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, at ¶ 248-257. The court deemed inapplicable the R.C. 2929.04(B)(1), (2), (3), and (6) mitigating factors: the victim induced the offense; the offender was not the principal offender; the offender committed the offense under duress, coercion, or strong provocation; or "the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of [his] conduct or to conform [his] conduct to the requirements of the law." *Id.* at ¶ 250.

{¶50} The court noted that during the penalty phase of Pickens's trial, his counsel had neither argued nor presented evidence to demonstrate the (B)(5) mitigating factor, lack of significant history of prior criminal convictions and delinquency adjudications. But counsel and the state had, prior to trial, stipulated to the two juvenile adjudications for drug possession underlying Pickens's weapons

16

charge and to his misdemeanor conviction for unauthorized use of property. This factor was thus accorded "some weight" in mitigation. *Id.* at ¶ 251.

{¶51} The court gave "significant weight" to Pickens's youth. While finding "little mitigating value" in his personal history and background, the court also gave "weight" under R.C. 2929.04(B)(7) to his mother's love and support, his employment history, and the fact that he had earned his GED. But the court found that his protestations of innocence "negated the mitigating weight that [the court] might otherwise give to his expressions of sorrow" for the deaths of Washington and the children. And the court found nothing mitigating in the nature and circumstances of Pickens's offenses and rejected as a mitigating circumstance residual doubt concerning his guilt of the offenses. *Id.* at ¶ 248, 252-255.

{¶52} The court concluded that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt. Specifically, the court held that the course-of-conduct and escaping-detection specifications accompanying the aggravated-murder charge involving Washington "strongly outweigh[ed]" the mitigating factors, that the child-murder specification accompanying the aggravated-murder charges involving the two children was entitled to "great weight," and that both the course-of-conduct and child-murder specifications charged with regard to the children "overwhelm the mitigating factors." *Id.* at ¶ 256.

{¶53} In the third ground for relief advanced in his postconviction petition, Pickens argued that his trial counsel had been ineffective in presenting evidence concerning his family history, background, and character. He asserted that counsel had presented in mitigation an "incomplete social history," when they failed to elicit from his mother "more comprehensive testimony" concerning her mental-health issues. He supported the ground with evidence in the form of family photos; an affidavit provided by his mother, attesting to her alienation from her family, health problems, and physical abuse by the men in her life; and affidavits provided by his

17

relatives and former boxing coaches, attesting to his father's absence from his life, his mother's poor parenting skills and suspected mental-health issues, and the neglect and physical and emotional abuse he suffered at the hands of his mother.

{¶54} In his sixth ground, Pickens argued that his trial counsel had been ineffective in presenting evidence demonstrating his "adaptability to the institutional setting." He supported that ground with outside evidence in the form of comments compiled in reports pertaining to his confinement in the Department of Youth Services for his juvenile drug offenses.

{¶55} In grounds four, five, and ten, Pickens asserted that he suffered from a learning disability and neuropsychological impairment as a consequence of blows to the head, and that his trial counsel had been ineffective in failing to reasonably investigate and present in mitigation testimony by a psychologist and a neuropsychologist to establish that fact or to request neurological testing to corroborate that testimony. He supported those grounds with affidavits by his boxing coaches, who attested to the physical punishment he endured as a boxer and during fights at school. He also offered the affidavits of a psychologist and clinical neuropsychologist. Psychologist Bob Stinson concluded that an expert should have been employed to assess Pickens and present in mitigation testimony about neurological or neuropsychological impairment, and that expert psychological testimony relevant to Pickens's history, character, and background should have been presented about the effects on his development and behavior as a consequence of his mother's youth when she gave birth, her inadequate parenting, his father's absence, the lack of structure and consistency in his life, and his family's mental-illness, domestic-violence, and abuse issues. Clinical neuropsychologist Barry S. Layton's examination of Pickens "permit[ted] a reasonable conclusion" that "prior and contemporaneously to [his] crimes," he had operated under the "effects of organic neurological dysfunction" as a consequence of "traumatic brain injury," causing

"neuropsychiatric decompensation * * * particularly under stress," and thus making him "prone to act[ing] impulsively in a manner to protect his ego or his physical integrity." Dr. Layton stated that expert opinion testimony concerning Pickens's neurological dysfunction could and should have been corroborated with neuroradiological testing and presented during the penalty phase of his trial.

{¶56} In his direct appeal, Pickens contended that his trial counsel had been ineffective in failing to request a neuropsychological examination or to present psychological evidence during the penalty phase of his trial. The Supreme Court noted that Pickens's counsel had had a duty to reasonably investigate his "background, education, employment record, mental and emotional stability, and family relationships." *Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, at ¶ 219, quoting *Goodwin v. Johnson,* 632 F.3d 301, 318 (6th Cir.2011). But the court further noted that counsel had had no duty to present every potential mitigation theory and, on that basis, rejected Pickens's assertion that counsel had been "duty-bound" to present psychological testimony in mitigation. *Id.* at ¶ 225.

{¶57} Moreover, the record on appeal did not demonstrate that counsel's investigation had been inadequate. Counsel hired two psychologists and a psychiatrist to evaluate Pickens. Billing records reflect multiple encounters with Pickens and his counsel. But the record on appeal did not reflect their conclusions. And the postconviction conclusions of Dr. Stinson and Dr. Layton, which Pickens had appended to his appellate brief, were not properly a part of the record. The court found that, in the absence of evidence to the contrary, the record allowed for the possibility that the defense's experts had concluded that a neurological evaluation was unnecessary, and that those experts had provided counsel with sufficient information about Pickens's psychological background to permit counsel to make an informed decision to present no psychological evidence in mitigation. Counsel's decision to present no psychological evidence was, in the court's assessment, a

strategic one. And because neither the failure to request a neuropsychological evaluation nor the decision to present no psychological evidence was demonstrably the result of counsel's violation of their duty to reasonably investigate Pickens's background, the court held that counsel had not been ineffective in either regard.

{¶58} That conclusion is not altered by the outside evidence offered by Pickens in support of his postconviction challenges to counsel's effectiveness during the penalty phase of his trial. To the contrary, Dr. Stinson provided in his affidavit what the record on appeal had not: insight into counsel's decision to present no psychological evidence in mitigation. Dr. Stinson averred that his review of the mitigation evidence had included an interview with the defense's "mitigation psychologist," and that she told him that she had "not identif[ied] any mitigating factors in [the] case." The evaluations conducted by Dr. Stinson and Dr. Layton led them to conclude otherwise. But in the absence of some suggestion at the time that the extensive evaluations conducted by the defense's experts had been in some way deficient, counsel had no duty to seek additional evaluations. Thus, the decision to present no psychological evidence could not be said to have been a product of counsel's violation of the duty to conduct a reasonable investigation, when that decision was made in consultation with three psychological experts whose evaluations of Pickens had led them to conclude that there was no mitigating psychological evidence to be presented.

{¶59} Nor could Pickens be said to have been prejudiced by counsel's failure to present in mitigation the outside evidence offered in support of grounds three through six and ground ten. The comments contained in the Department of Youth Services records that were offered to show Pickens's adaptability to an institutional setting were offset by contrary comments in those records and by an uncle's statement in his affidavit that Pickens "went downhill" following his confinement there.

{¶60}  The Supreme Court gave "weight" under R.C. 2929.04(B)(7) to Pickens's mother's love and support.  The affidavits of estranged family members and former coaches offered concerning his mother's life and parenting skills conflicted with the defense's portrayal of her as a loving and supportive parent.  And those affidavits provided nothing more than speculation about her alleged mental-health issues.

{¶61}  The psychological and neuropsychological evidence, offered to show that Pickens suffered from "organic neurological dysfunction" and that the stress of Washington's rape accusations might have caused him to "act impulsively," could not plausibly have been offered to demonstrate the R.C. 2929.04(B)(3) or (7) mitigating factors.  Throughout the guilt and penalty phases of his trial, Pickens maintained his innocence of the murders.  And the evidence adduced at trial proved beyond a reasonable doubt that Pickens had killed Washington and the children purposefully and deliberately, not impulsively or as a consequence of a mental disease or defect that prevented him from appreciating the criminality of his conduct or conforming his conduct to the law.

{¶62}  The Ohio Supreme Court has long held, and recently reaffirmed, that the decision to present or not present mitigating evidence is a matter of trial strategy, and that "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  *State v. Cepec*, 149 Ohio St.3d 438, 2016-Ohio-8076, 75 N.E.3d 1185, ¶ 123, citing *State v. Hand,* 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 225, and quoting *Strickland,* 466 U.S. at 690-691, 104 S.Ct. 2052, 80 L.Ed.2d 674.  Pickens failed to support grounds three through six and ground ten with outside evidence demonstrating that his counsel's performance in preparing for and presenting the case in mitigation fell below an objective standard of reasonableness or was so deficient that the  penalty phase of his trial could not have reliably produced a just result.  *See Powell,* 90 Ohio App.3d at 266, 629 N.E.2d 13.  Therefore, the common pleas court properly denied relief on those grounds.

{¶63} *Cumulative error.* In his eleventh ground for relief, Pickens contended that the cumulative effect of the constitutional deprivations alleged in his petition's other claims was to deny him a fair trial. A judgment of conviction may be reversed if the cumulative effect of errors deemed separately harmless is to deny the defendant a fair trial. *State v. DeMarco,* 31 Ohio St.3d 191, 509 NE.2d 1256 (1987), paragraph two of the syllabus. The doctrine of "cumulative error" will not provide a basis for reversal in the absence of multiple errors. *State v. Madrigal,* 87 Ohio St.3d 378, 398, 721 N.E.2d 52 (2000). Because Pickens failed to support his postconviction petition with evidence demonstrating multiple constitutional deprivations, the common pleas court properly denied the cumulative-error challenge advanced in his eleventh claim. *See State v. Van Hook,* 1st Dist. Hamilton No. C-910505, 1992 WL 308350 (Oct. 21, 1992).

{¶64} We, therefore, conclude that the common pleas court properly denied Pickens relief from his convictions on the grounds presented in his postconviction petition. Accordingly, we overrule his second assignment of error.

## *Discovery*

{¶65} In his third and fourth assignments of error, Pickens challenges the overruling of his motions for discovery and for the funds for neurological testing to aid him in that discovery. This challenge is untenable.

{¶66} R.C. 2953.21(A)(1)(d) now confers upon a common pleas court the discretion to permit certain kinds of discovery by a capital petitioner "for good cause shown." But in 2011, when Pickens filed his postconviction petition, the postconviction statutes did not contemplate discovery in the initial stages of a postconviction proceeding. *State ex rel. Love v. Cuyahoga Cty. Prosecutor's Office,* 87 Ohio St.3d 158, 159, 718 N.E.2d 426 (1999); *State v. Zuern,* 1st Dist. Hamilton Nos. C-900481 and C-910229, 1991 WL 256497 (Dec. 21, 1991).

{¶67} Pickens was not entitled to discovery or the funding for experts to aid in discovery, because his postconviction claims were subject to dismissal without an evidentiary hearing. Therefore, we overrule the third and fourth assignments of error.

### *We Affirm*

{¶68} Finding no merit to any aspect of the challenges advanced in this appeal, we affirm the common pleas court's judgment dismissing Pickens's postconviction petition.

Judgment affirmed.

CUNNINGHAM, P.J., ZAYAS and MILLER, JJ.

Please note:

The court has recorded its own entry on the date of the release of this opinion.